JUDGE STEIN    '09 CIV 7436

BROWN GAVALAS & FROMM LLP
Attorneys for Plaintiff
DIVA MARITIME COMPANY
355 Lexington Avenue
New York, New York 10017
Tel: (212) 983-8500
Fax: (212) 983-5946



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DIVA MARITIME COMPANY,

                Plaintiff,

   -against-

MOWBRAY SHIPPING LTD.,
GULF RESOURCES DEVELOPMENT CORP., and
OVERSEAS MATERIAL SUPPLY,

              Defendants.
------------------------------------------------------------------X

09 Civ.

**<u>VERIFIED COMPLAINT</u>**

Plaintiff, DIVA MARITIME COMPANY ("Plaintiff"), by its attorneys, Brown Gavalas & Fromm LLP, as and for its Verified Complaint against defendants, MOWBRAY SHIPPING LTD. ("Mowbray"), GULF RESOURCES DEVELOPMENT CORP. ("Gulf Resources"), and OVERSEAS MATERIAL SUPPLY ("Overseas") (collectively "Defendants"), alleges upon information and belief as follows:

    1.    This is a case of admiralty and maritime jurisdiction, as hereinafter more fully appears, and is an admiralty or maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. The Court has jurisdiction under 28 U.S.C. § 1333.

    2.    At all material times, Plaintiff was and now is a corporation duly organized and existing under and by virtue of the laws of the Marshall Islands, with an office and place of business in a foreign country.

3.      On information and belief, at all material times defendant Mowbray was and still is a corporation existing under and by virtue of the laws of the British Virgin Islands, with an office and place of business in Tortola, B.V.I.

4.      On information and belief, at all material times defendant Gulf Resources was and still is a corporation existing under and by virtue of the laws of a foreign country, with an office and place of business in Dubai, United Arab Emirates.

5.      On information and belief, at all material times defendant Overseas was and still is a corporation existing under and by virtue of the laws of a foreign country, with an office and place of business in Dubai, United Arab Emirates.

6.      At all material times, Plaintiff was the registered owner of the motor vessel BASIL ("the Vessel").

7.      On or about May 15, 2009, Plaintiff, as owner, and Mowbray, as charterer, entered into an agreement whereby Plaintiff agreed to let and Mowbray agreed to hire the Vessel for a "one Time-Charter via East Coast South America to Persian Gulf" pursuant to certain terms and conditions set forth in the parties' agreement ("the Charterparty"). A copy of the Charterparty is annexed hereto as Exhibit "A".

8.      Under the terms of the Charterparty, bills of lading for the cargo were to be issued as presented in strict conformity with the Mate's Receipts and to be released immediately upon completion of loading.

9.      Pursuant to the Charterparty, Plaintiff loaded cargoes aboard the vessel at San Lorenzo and Bahia Blanca, Argentina. However, despite being authorized to do so, on information and belief, Mowbray elected for its own commercial purposes not to issue any bills of lading with respect to the cargoes at the time the Vessel was loaded.

10.    Upon information and belief, defendant Gulf Resources purchased the cargoes while the Vessel made her voyage between Argentina and Iran.

11.    During the voyage, Defendants informed Plaintiff that they wished to have bills of lading issued for most of the cargo and to cancel and re-issue bills issued for other parts of the cargo, none of which bills would be available at the discharge port at the time the Vessel was expected to arrive there.

12.    In order to prevent any delay in discharging the cargoes, the parties entered into an agreement whereby Plaintiff agreed to discharge the cargoes immediately, subject to certain terms and conditions set forth in the parties agreement ("the Agreement"). A copy of the Agreement is annexed hereto as Exhibit "B".

13.    As a condition precedent to the issuance of bills of lading and the commencement of discharge, Clause 2(v) of the Agreement required Defendants to pay to Plaintiff sixteen days' hire, at the Charterparty rate of $12,500.00 per day, to be received by Plaintiff by no later than August 15, 2009. Less commission and other fees, said hire amounts to $190,934.00.

14.    On information and belief, Defendants attempted to make this payment to Plaintiff on or about August 17, 2009. However the funds have still not been received in Plaintiff's account. Despite repeated demands to representatives of Mowbray for information as to the routing of Defendants' payment which might enable Plaintiff to trace its whereabouts, Defendants have failed to provide such information.

15.    Plaintiff has now determined that Defendants hire payment was restrained by HSBC Bank pursuant to an order of maritime attachment signed by Judge P. Kevin Castel in *Candela Shipping Co., Ltd. v. Mowbray Shipping Ltd.*, 09 Civ. 5810 (AKH).

16.    Defendants have failed to disclose that fact, and have failed to make any further

payments to Plaintiff, despite their obligations under the Agreement and the fact that the sixteen days' hire payment remains due and owing and was to have been effected before commencement of discharge.

17.    Discharge has now been completed.  However, Defendants remain in breach of their obligations under the Agreement and Charterparty.

18.    Under the terms of the Agreement, all disputes between the parties are to be submitted to the English High Court of Justice in London, pursuant to English law.  Plaintiff intends to commence proceedings in London imminently.

19.    This action is in aid of said English High Court proceedings.  Plaintiff seeks to obtain adequate security to satisfy a potential judgment in Plaintiff's favor.

20.    In addition to recovering the principal amount due to Plaintiff under the Agreement, Plaintiff also fully anticipates recovering interest, costs, and attorneys' fees, which are routinely awarded to the prevailing party in the High Court.  As best as can now be estimated, Plaintiff expects to recover the following amounts in the High Court proceedings:

| | | |
|---|---|---|
| a. | On the principal claim | $190,934.00 |
| b. | 2 years of interest at 6. 5% per annum, compounded quarterly | $26,279.96 |
| c. | Legal Costs (attorneys' fees, etc.) | $30,000.00[1] |
| | TOTAL | $247,213.96 |

21.    Plaintiff has conducted an investigation as set out in the accompanying affidavit of Peter Skoufalos and Plaintiff verily believes that Defendants cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure.

---

[1] Based on Lawyer's costs for fifty hours, including pleadings, witness statements, and summary judgment hearing with counsel, based on a conversion rate of £1 = $1.65088 (*See* http://www.xe.com/ucc).

22.     Defendants are shipping and trading companies with international operations. In addition, Defendants occasionally charter vessels to comply with obligations incurred by Defendants in contracts they enter into with other parties. Consequently, it is believed that Defendants will be making and receiving hire and/or freight payments to and from the owners of vessels chartered by Defendants. Defendants will also be receiving dollar-denominated payments for their services. Moreover, Defendants will likely be making dollar-denominated payments in payment of Defendants' own commercial obligations.

23.     It is the well-established custom and practice of the industry, that charter hire or freight paid by charterers for the charter of vessels, is payable in United States Dollars. In addition, bunker fuel for ships, which must often be paid for by the charterer, is customarily quoted and paid for in United States Dollars. Further, agents' invoices for services and disbursements rendered to vessels at local ports are customarily rendered and paid in United States Dollars.

24.     The hire payments, including the failed sixteen days' hire payment, were made through banks located in the Southern District, and, as noted above, funds belonging to Gulf Resources are currently under attachment at HSBC Bank's New York City branch.

25.     Upon information and belief, Defendants cannot be found within the District, within the meaning of Supplemental Rule B of the Federal Rules Civil Procedure, but are believed to have or will have during the pendency of this action assets within this District, specifically including cash, funds, freight, hire, accounts, electronic fund transfers and other property, in the hands of garnishees in the District including, but not limited to, American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New

York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are believed to be due and owing to the Defendants.

Plaintiff prays:

A. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That because the Defendant cannot be found within this District pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of the Court to issue Process of Attachment and Garnishment, pursuant to Rule B of the Supplemental Admiralty Rules, attaching all cash, goods, chattels, letters of credit, bills of lading, effects, debts and monies, tangible or intangible, or any other funds held by any garnishee, including American Express Bank, Ltd.; ABN-AMRO Bank; Bank of Tokyo Mitsubishi UFJ Ltd.; Barclays Bank; Calyon; Standard Chartered PLC; HSBC Bank; Bank of America; BNP New York; Bank of New York; J.P. Morgan Chase; Deutsche Bank; Citibank; Mashreq Bank; Bank of China; UBS AG; and Wachovia Bank, which are due and owing to the Defendant, in the amount of $247,213.96, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B, answer the matters alleged;

C. That this action be stayed and this Court retain jurisdiction over this matter through the entry of any judgment or award, and any appeals thereof; and

D.  That Plaintiff have such other, further and different relief as this Court may deem just

and proper.

Dated:  New York, New York
        August 24, 2009

                                    BROWN GAVALAS & FROMM LLP
                                    Attorneys for Plaintiff
                                    DIVA MARITIME COMPANY


                            By:     _____
                                    Peter Skoufalos (PS-0105)
                                    355 Lexington Avenue
                                    New York, New York 10017
                                    Tel: (212) 983-8500
                                    Fax: (212) 983-5946

## VERIFICATION

STATE OF NEW YORK )
: ss.:
COUNTY OF NEW YORK )

PETER SKOUFALOS, being duly sworn, deposes and says:

1.    I am a member of the bar of this Honorable Court and of the firm of Brown

Gavalas & Fromm LLP, attorneys for Plaintiff.

2.    I have read the foregoing Verified Complaint and I believe the contents thereof

are true.

3.    The reason this Verification is made by deponent and not by Plaintiff is that

Plaintiff is a foreign corporation, no officer or director of which is within this jurisdiction.

4.    The sources of my information and belief are documents provided to me and

statements made to me by representatives of the Plaintiff.

PETER SKOUFALOS

Sworn to before me this
24th day of August, 2009

Notary Public

EVAN B. RUDNICKI
Notary Public of the State of New York
No. 02RU6142314
Qualified in Rockland County
Term Expires March 13, 20 _

# EXHIBIT "A"

# Time Charter



GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; Octo...

1 **This Charter Party**, made and concluded in *London*...................................................*15th*... day of ...*May, 2009*.......19...

2 Between *Messrs DIVA MARITIME COMPANY, Marshall Islands* .....

3 Owners of the good *St Vincent & Grenadines* Flag. ~~Steamship~~/ Motorship *"BASIL"* ............. ~~of~~ *for vessel's description See Clause 29.*

4 of ...*41.300*...... tons gross register, and ......*28,444*....... tons net register, having engines of ...................................................... indicated horse power

5 and with hull, machinery and equipment in a thoroughly efficient state, and classed ......*Lloyds*.............................................................

6 at ....................................... of about ................................... cubic feet bale capacity, and about ......*76,440 metric*............. tons of 2240 lbs.

7 deadweight capacity ~~(cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity,~~

8 ~~allowing a minimum of fifty tons)~~ on a draft of ...*13,24*...... ~~feet~~ *metres*.... ~~inches~~ on ...*salt*.......... Summer freeboard, inclusive of permanent bunkers,

9 which are of the capacity of about ................................... tons of fuel, and capable of steaming, ~~fully laden,~~ *average laden/ballast* under good weather

10 conditions about ..................................... knots on a consumption of about ......................... tons of best ~~Welsh coal - best grade fuel oil - best grade Diesel oil,~~

11 now *in Ballast - See itinerary Clause 47* .......................................................

12 ..................................... and *MOWBRAY SHIPPING LIMITED, Tortola, B.V.I.* Charterers ~~of the City of~~

13 **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 ~~about~~ *one Time-Charter via East Coast South America to Persian Gulf always via safe port(s), safe berth(s), safe place(s), safe anchorage(s), always within Institute Warranty Limits, always afloat (except where NAABSA in Clause 6), with a cargo of HSS in bulk (see permitted cargo clause 68) always lawfull/harmless/non corrosive suitable for this vessel always to be loaded as per IMO Regulations and Recommendations.*

15 within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. *Acceptance of delivery by the Charterers shall not constitute any waiver of the Owners obligations or the Charterers right hereunder*

18 Vessel to be placed at the disposal of the Charterers, ~~at~~ *on arrival bunkering anchorage, Singapore 0001 16th - 2400 18th* ........

19 *May, 2009, any time, day or night, Sundays and Holidays included, (vessel giving ETA 16th May, 2009 late pm, all going well, weather permitting, unforeseen circumstances excepted)*

20 ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21 ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on *arrival load port* ~~her delivery to be~~

22 ready to receive *any permissible* cargo with clean-swept holds *dry and free of loose rust/rust scale* and tight, staunch, strong and in every way fitted for the *ordinary cargo* service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers ~~and firemen~~ for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, ~~including petroleum or its products, in proper containers, excluding~~ *cargo of bulk grains, all cargo to be loaded, stowed and discharged and in accordance with IMO/Solas recommendations of code of safe practice for solid bulk cargoes - Charterers not to load any cargo that requires CO2 or IGS fittings under IMO regulations. See cargo exclusions Clause 68. Cargo intention is only bulk harmless grain/grain products excluding bulk rice and sunflower seed expellers.*

26 ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27 ~~all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North~~

28 ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29 ~~Mexico, and/or South America~~ *and/or Europe*

30 ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31 ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic,~~ *See Clause 67.*

32 .......................................................

33 .......................................................

34 .......................................................

35   as the Charterers or their Agents shall direct, on the following conditions:

36      1.  That the Owners shall provide and pay for all provisions, *lubricants, fresh water,* wages and consular *immigration* shipping and discharging fees of the Crew; shall pay for the

37   insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service *with certificates valid for international trading and compliance with current requirements at ports of call.*

39      2.  That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *River, Canal Tolls, compulsory, customary* Pilotages, *including Skaw, Magellan, Dardanelles, St Lawrence, Torres Straits, Barrier Reef pilot, Japan inland sea pilot, North sea pilot, Baltic sea pilot, Bosphorus, all River Plate,* Agencies, Commissions, *garbage dues (compulsory or if charged by custom of the port),*

40   Consular Charges (except those pertaining to the Crew *and flag of the vessel),* and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel *and/or Owners* is/*are* responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43   charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44   ~~of six months or more.~~

45   Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, ~~but~~

46   ~~Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards~~

47   ~~for dunnage, they making good any damage thereto.~~

48      3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49   ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ................................... ~~tons and not more than~~

50   ................................... ~~tons and to be re-delivered with not less than~~ ................................... ~~tons and not more than~~ ................................... ~~tons.~~

51      4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of *US$12,500 (Twelve Thousand Five Hundred*

52   *Dollars)* ....... United States Currency per *day including overtime net of taxes on hire, if any, payable fifteen days in advance* ~~ton on vessel's total deadweight carrying capacity, including bunkers and~~

53   ~~stores, on~~ ................................... ~~summer freeboard, per Calendar Month,~~ commencing on and from the *hour of the* day of her delivery, as aforesaid, and at

54   and after the same rate for any part of a *day,* ~~month;~~ hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55   wear and tear excepted, to the Owners (unless lost) at *any time day/night, Sundays and Holidays/and Fridays and Holidays*

56   *included on passing MUSCAT southbound* unless otherwise mutually agreed. Charterers are to give Owners not less than *15* days *approximate and 10 days definite*

57   notice of vessels expected date of re-delivery, and probable port.

58      5.  Payment of said hire *less commissions* to be made in *See Clause 69* ~~New York~~ in cash in United States Currency, *every 15 (fifteen) days* ~~semi-monthly~~ in advance, and for the last *fifteen days* ~~half month~~ or

59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61   hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63   ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64   ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65   Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *and, provided Owners prior authorisation has been given,* by the Charterers or their Agents, subject

66   ~~to 2 1/2%~~ commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67   of such advances.

68      6.  That the cargo or cargoes be laden and/or discharged in any *safe port or safe anchorage or safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69   direct, provided the vessel can safely lie always afloat at any time of tide, except at such places *in Argentina, Brazil and Uruguay* where it is customary for similar size vessels to safely

70   lie aground *but in anycase always at Charterers risk and responsibility.*

71      7.  That the whole reach of the Vessel's Hold, *no deck cargo,* ~~Decks,~~ and usual places of loading (not more than she can reasonably stow and carry), also

72   accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73   tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow. Charterers~~

74   ~~paying Owners~~ ................................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75   ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers allowed.*

76      8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77   boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78   agency; and Charterers are to load, stow, ~~and~~ trim *tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79   cargo as presented, in *strict* conformity with Mate's or Tally Clerk's receipts.

80      9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82  10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his own risk and responsibility (by signing usual LOI)* and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $1.00 *US$10.00* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying *See Clause 66* ~~at the current rate per meal, for all such victualling.~~

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, *promptly at the end of voyage* when required, with a true copy of daily Logs *abstract*, showing the course of

89  the vessel and distance run and the con- sumption of fuel.

90  12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Natural ventilation only. See also Clause 73.*

91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ............................................................

92  ........................................................................................................................................................................................................................

93  ~~on giving written notice thereof to the Owners or their Agents~~ ............................... ~~days previous to the expiration of the first named term, or any declared option.~~

94  14. That if required by Charterers, time not to commence before ............*0001 hours 16th May, 2009* ........................... and should vessel

95  not have given written notice of readiness on or before ...............*18th May, 2009* ........................ but not later than 4 p.m. *2400 hours* Charterers or

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97  15. That in the event of the loss of time from deficiency *and/or default* of crew men*/Officers, including Master including Strike of Officers and/or crew or deficiency of* ~~of~~ stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause

99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby *actually lost* ~~lost~~ *for Charterers unless was caused*

100  *by Charterers Agents/Servants;* and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

101  thereof, and all extra expenses *directly related* shall be deducted from the hire.

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

106  purpose of saving life and property.

107  17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* ~~New York~~,

108  one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for

109  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men *and members of the London Maritime Arbitrators Association*.

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights*/sub-hires* for any amounts due under this Charter, including General Aver-

111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess

112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which

113  might have priority over the title and interest of the owners in the vessel.

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

115  Crew's proportion. General Average shall be adjusted, stated and settled, *in London* according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of

116  York-Antwerp Rules 1924, *as amended 1990 and any further amendments thereto.* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~

118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~

120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such each deposit as the carrier~~

121  ~~or the agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~

122  ~~required, be made by the goods, shippers, consignees or owner of the goods to the carrier before delivery. Such deposit shall, at the option of the~~

123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~

124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~

125  ~~United States money.~~

126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~

127  ~~whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract, or otherwise, the~~

128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~

129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~

130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~

131  ~~ships belonged to strangers.~~

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire is not to contribute to General Average,*

133  20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity,~~ and the

134  cost of replacing same, to be allowed by Owners.

135  21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~

136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~

137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 *No drydock unless in case of emergency.*

139

140  ~~22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *free of expense to the*
*Charterers sufficient lights for night work in all compartments as on board and to maintain same in*
*efficient working order.* ~~lanterns and oil for~~

143  ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144  ~~Charterers to have the use of any gear on board the vessel.~~

145  ~~23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers, in the event of a disabled winch or winches, or~~
149  ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150  ~~thereby.~~

151  ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153  ~~etc," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder:~~

155  ~~U. S. A. Clause Paramount~~

156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160  ~~Both to Blame Collision Clause~~

161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~

167  25. The vessel shall not be required to *force ice or follow ice breakers or* enter any ice-bound port, or any port where lights or light-ships
168  have been or are about to be with-
169  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
port or to get out after having completed loading or discharging.

170  26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.

172  27. A commission of ~~2 1/2~~ 1.25 per cent is payable by the Vessel and Owners to *GALBRAITH'S LIMITED, London,*
173  *and 1.25% to TRYTON SHIPBROKING S.A., Athens* .................................................................
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175  28. An address commission of ~~2 1/2~~ 5.00 per cent payable to *Charterers* ..... on the hire earned and paid under this Charter *deductible from*
*payment(s).*

*Additional Clauses 29 to 92, both inclusive as attached herein, to be incorporated and form part of this*
*Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship
Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the
insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having
been made by the licensee or end user as appropriate and not by the author.

ADDITIONAL CLAUSES TO m.v. "BASIL"

CHARTER PARTY DATED 15ᵗʰ MAY 2008

29.    **Vessel's Description:**    (All details 'about')
m.v. "BASIL"
Vessel is grain clean.
Gearless Bulkcarrier built 1983.
Flag St Vincent & Grenadines.
Port Registry: Kingstown.
DWT:       76,440 mt on 13,816 m SSW – TPC: 70
LOA / Beam:244.90 m / 32.207 m
9 Holds / Hatches
GT:   INT 41,300 mt – Suez 42,330.49 – Panama 42,869.94
NT :   INT 28,444 mt – Suez 37,065.27 – Panama 35,489.33
Class : Lloyds
Constants excluding fresh water : about 450 metric tons.

Cubic breakdown per hold:
1) 321197.64   2) 372106.40   3) 318103.36   4) 382690.24   5) 317837.08
6) 382102.60   7) 317379.40   8) 382358.99   9) 301728.94
Total grain capacity:  about 3,095,504 cuft.

Hatch dimensions in metres:
No 1)  12.34 x 15.26          Nos 3,5,7,9)  11.29 x 15.26
No 2)  14.40 x 15.26          Nos 4,6,8)   15.05 x 15.26
Hatch covers: all MacGregor Fwd/Aft rolling type

Speed/consumptions average laden/ballast without guarantee in good weather up to
maximum Beaufort 4 and smooth sea conditions and no adverse currents:
About 13.3 knots on about 37 metric tons IFO (180 cst) plus about 3 metric tons MDO.
In port idle: about 2.5 metric tons MDO.
Vessel has the liberty to burn extra diesel oil when manoeuvering, in and out of
confined/narrow spaces, canals, upriver, and/or other restricted areas, entering or
leaving ports, at/off anchorage, for ballasting/deballasting, for shifting, etc.

Bunkers supplied to the vessel by Charterers always to conform to ISO 8217/2005
specifications or any amendments thereof:
IFO maximum 180cst class RME 25 – ISO 8217/2005
MDO – ISO class DMB – ISO 8217/2005

Vessel has Australian hold ladders.
Vessel not CO2 fitted.

All figures/details 'about' without guarantee.

- 2 -

29.    cont ....

Vessel is fully ISM/ISPS certified.
Vessel is P and I covered with the American Club.
Vessel is a self-trimming bulkcarrier.
Hull and Machinery value and name of Insurers: US$6 million.  Insurance placed in Europe.  Leader is Amlin.
Last three cargoes, last first, 3) iron ore  2) iron ore  1) coal.

- Owners are:        DIVA MARITIME COMPANY, Marshall Islands.
- Managers are:      OVERSEAS MARINE ENTERPRISES INC
- Vessel's contact details as follows:
                     m.v. BASIL
                     Bridge Tel:  00870761155917
                     Master's Cabin Tel: 00870761155918
                     Fax:  00870761155919
                     Email: basilcl@skyfile-c.com
                     Master's Name: Captain Reynaldo M. Mortel

30.    **War Risk Insurance Clause:**
Basic war risk insurance to be for Owners account.  Any additional war risk insurance for hull and machinery, blocking and trapping due to vessel trading to restricted areas, war risk bonuses to Master, Officers and crew for trading restricted areas and any war risk/piracy/kidnap/ransom insurance for passing any high risk areas to be for Charterers account.

31.    **Cuba/North Vietnam:**
Vessel has not called Cuba/Vietnam under present Ownership.

32.    **Boycott:**
In the event of loss of time due to strike, lockouts, labour stoppage or boycott of the vessel by shore labour or arising from government restrictions by reason of vessel's flag or the terms and conditions under which the Master and/or Officers and/or crew are employed or by reason of vessel's present Ownership, or of previous trading of this vessel or of previous or present trading of any other vessel under same Ownership, operation, management or control, payment of hire shall cease from the time thereby lost and Owners to pay directly related losses occasioned thereby.

33.    **Grace Period:**
When there is failure to make "punctual and regular payment" of hire, the Owners shall give the Charterers three clear banking days written notice to rectify the failure and when so rectified within three days following Owners notice, the payment shall stand as "punctual and regular" and the Owners will not be entitled to exercise any rights of withdrawal.

- 3 -

34. **Deratisation Certificate:**
The vessel to have deratisation certificate and/or equivalent fumigation certificates on board at time of delivery, the validity of which is to be maintained by Owners in their time and at their expense during the currency of this Charter Party.

35. **Quarantine/Radio Practice:**
Any time and expense for quarantine due to pestilence, illness of Master, Officers and crew shall be for Owners account. Further, the vessel shall be in possession of valid certificate necessary to obtain radio pratique at port or ports where radio pratique is available.

36. **Health Certificate:**
The vessel shall be in possession of necessary certificate to comply with Safety and Health Regulations and all current requirement at all ports of call.

37. **Equipment:**
The Vessel's equipment shall comply with the regulations and/or requirements in effect at port or ports of call and canals and countries in which the vessel will be employed. The Owners also guarantee that the vessel shall be at all times in possession of valid and up-to-date certificates on board to comply with such regulations and/or requirements.

38. **ITF:**
The Owners of the vessel guarantee that the minimum terms and conditions of employment of the crew are now or will be, prior to the presentation of the vessel for loading and will remain for the period of this Charter Party covered by an ITF agreement or a bona fide Trade Union agreement acceptable to the ITF, failing which vessel to be off-hire for any time lost and any directly related extra expenses to be for Owners account.

39. **Stevedore Damages Clause:**
Charterers are responsible for any damage done to the vessel by stevedores during loading and/or discharging. The Master to give written notice of such damage to the Charterers or agents promptly after occurrence or in case of hidden damages, as soon as same can reasonably be discovered. In case of repairs of damages which have been noted in off-hire survey and for which Charterers are responsible, Charterers have the privilege of redelivering the vessel without repairing such damages except those affecting vessel's cargo carrying capability and seaworthiness/stability and to carry them out at a later stage and even during off-hire period, or during period when Owners are drydocking or doing repairs for their own account provided same does not interfere with next charter damages affecting seaworthiness are always to be repaired immediately in Charterers time and expense.

40. **P and I Club:**
The Owners guarantee that the vessel is entered and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party.
The name of Owners P and I Club is:  American Club

- 4 -

41.     **NYPE Interclub Agreement:**
Any cargo claims shall be settled in accordance with NYPE Interclub Agreement and any amendments thereto.

42.     **Deductions from Hire:**
The Charterers may deduct from hire all off-hires and any amounts disbursed for Owners account where supported by vouchers. The Charterers may deduct from last sufficient hire payment the estimated expenses incurred by the Charterers for Owners account, for which however, vouchers have not yet reached Charterers for submission to Owners, but maximum deduction for Owners estimated expenses to be US$1,000 per port unless agents proforma disbursements account shows more than US$1,000, then all Owners expenses as per proforma disbursements account will be deducted from hire payment. See also Clause 53.

43.     **On/Off-Hire Survey:**
Joint on/off-hire bunker and condition survey to be carried out at first load port and redelivery in order to ascertain the vessel's bunker quantities remaining on board on delivery/redelivery by one surveyor appointed by the parties, time actually lost, if any, for on-hire survey to be for Owners account and time for off-hire survey to be for Charterers account, but surveyors fees to be equally shared between Owners and Charterers.

44.     **BIMCO Piracy Clause for Time Charter Parties 09.03.09:**
(A) The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to any actual, threatened or reported acts of piracy, whether such risk of piracy existed at the time of entering into this Charter Party or occurred thereafter. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(B) If the Owners do not give their consent they shall immediately inform the Charterers and the Charterers shall be obliged to issue alternative voyage orders and any time lost due to compliance with such orders shall not be considered off-hire. The Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(C) If the Owners consent or if the vessel proceeds to or through an area exposed to risk of piracy the Owners shall have the liberty;

(i) to take reasonable preventive measures to protect the vessel, her crew and cargo including but not limited to taking a reasonable alternative route, proceeding in convoy, using escorts, avoiding day or night navigation, adjusting speed or course, or engaging security personnel or equipment on or about the vessel;

- 5 -

44.    cont ....

(ii) to comply with the orders, directions or recommendations of any underwriters who have the authority to give the same under the terms of the insurance;

(iii) to comply with all orders, directions, recommendations or advice given by the Government of the Nation under whose flag the vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group, including military authorities, whatsoever acting with the power to compel compliance with their orders or directions;

(iv) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

and the Charterers shall indemnify the Owners for any claims from holders of Bills of Lading or third parties caused by such orders.

(D) Costs.

(i) If the vessel proceeds to or through an area where due to risk of piracy additional costs will be incurred including but not limited to additional insurance, additional personnel and preventative measures to avoid piracy attacks, such costs shall be for the Charterers account.   Any time lost waiting for convoys, following recommended routeing, timing, or reducing speed or taking measures to minimise risk, shall be for the Charterers account and the vessel shall remain on hire;

(ii) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first;

(iii) If the underwriters of the Owners insurances should require payment of additional premiums and/or calls because, pursuant to the Charterers orders, the vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of piracy risks, then the actual additional premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(E) If the vessel is attacked or seized by pirates any time lost shall be for the account of the Charterers and the vessel shall remain on hire.  If the vessel is seized the Owners shall keep the Charterers closely informed of the efforts made to have the vessel released.

- 6 -

44.  cont ....

(F)  If in compliance with this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

45.  **Capture, Seizure, Arrest:**
Should the vessel and/or her Master and/or any of her Officers and crew be arrested during the currency of this Charter Party, at the suit of any person having or purporting to have claims against or any interest in the vessel and/or said Master and/or Officers and crew, hire under this Charter Party shall not be payable in respect of any period whilst the vessel remains under arrest or remains unemployed or prevent the full working of the vessel as the result of such arrest or is delayed in any way due to the detention of restraint of Master, Officers or crew, and the Owners shall reimburse to the Charterers any expenditure which they may directly incur in respect of the said arrest and vessel to be off-hire for any time actually lost.  This clause not to apply in case the arrest or delay is caused by any act, neglect or default or omission of Charterers or their servants.

46.  **Fines:**
Any fines imposed on the vessel, Owners, Master, Officers or members of the crew or on Charterers originating from Master, Officers or crew, contravening local port and/or customs regulations, particularly as regards smuggling, to be for Owners account and Charterers are not to be responsible for any consequence resulting from such offence. Any time lost due to above circumstances to be for Owners account and to be deducted from hire.

47.  **Itinerary:**
Vessel is presently in ballast giving ETA Singapore 16th May, 2009, late pm, all going well, weather permitting, unforeseen circumstances excepted.

48.  **Gangway Watchmen:**
Gangway watchmen, if compulsory, and ordered by Charterers or their agents to be for Charterers account.  If required by vessel, then same to be for Owners account.  If ordered by Port Authorities, then same to be for Charterers account.

49.  **Holds Condition/Cleaning:**
On arrival first loading port, holds to be clean and ready to receive Charterers intended cargo failing which vessel to be off-hire until holds are passed and any directly related expenses to be for Owners account.  However, in case some holds are ballasted as per port requirements then Charterers to be responsible for any time lost to prepare those holds as well as all directly related expenses.

In lieu of hold cleaning on redelivery US$5,000 (Five Thousand Dollars) lumpsum.

50.  **Preparing for Loading/Discharging:**
The crew to open and close hatches when and where required free of expense to the Charterers where local regulations permit, otherwise to be for Charterers account.

- 7 -

51. **Protective Clauses:**
General Clause Paramount, New Both-to-Blame Collision Clause, P and I Bunker Deviation Clause, New Jason Clause, ISPS Clause and Conwartime 1993 are deemed part of and incorporated under this Charter Party and shall be contained in Bills of Lading issued hereunder.
All Bills of Lading issued under this Charter Party are to contain Clause Paramount which incorporate the Hague Visby rules.

52. **Bills of Lading:**
Master is to sign Bills of Lading for cargo as presented in strict conformity with Mates receipt. Bills of Lading are to be released to Charterers immediately on completion of loading.
Master is to authorise vessel's port agents in writing that they may issue/sign/release 'clean on board' Bills of Lading to Charterers agents issued strictly in accordance with Mates receipts. Mates receipts are not to be unduly claused by Master and/or the Agents.
The cargo is to be inspected, graded and weighed during loading by SGS officials. Mates receipts are to state grades and weights as per SGS certificates.
No original Bills of Lading to be carried on board during sea passage.
No liner and through Bills of Lading to be issued.
In case multiple Bills of Lading will be used, vessel/Master not to be responsible for the distribution of the cargo to various Receivers.

53. **Bunkers on Delivery/Redelivery:**
Bunkers on delivery about 180 metric tons HSFO plus about 34 metric tons LSFO and about 20 metric tons MDO.
Bunker prices US$356.00 per metric ton for IFO and US$500.00 per metric ton for MDO.
Bunker quantities and prices on redelivery to be the same as on delivery.

Owners to have the right to bunker the vessel for their own account at any port of call during this time charter trip (during the last trip of the time charter period) provided same is not interfering loading or discharging operation.

All bunkers supplied by the Charterers to be in accordance with ISO 8217 – 2005 (E) quality and to comply with the requirements of Marpol 73/76 annexe VI relating to permissible sulphur content in the fuel and it's suitability for trading in each intended geographical area.

During bunkering operations Charterers to appoint and pay for Fobas surveyor to be present and take samples of bunkers supplied to the vessel so as Fobas can perform quality/quantity survey analysis and Charterers to send survey analysis report to Owners.

- 8 -

53.   cont ....

Charterers to pay for value of bunker on delivery together with first hire.  Owners option to bunker the vessel prior redelivery provided not interfering with Charterers operations.  Charterers to deduct value of bunkers on redelivery from last hire payment and always providing they have supplied/replenished bunkers to the vessel before they can make any such deduction.

54.   **Superficial Inspection:**
The Charterers shall have the option of holding a superficial inspection of the vessel at any time during this Charter Party.  The Owners and Master shall give every facility and assistance.

55.   **ISPS and ISSC Regulations:**
Owners and Master are fully aware of and compliant with ISPS and ISSC regulations and Bimco ISPS clause to be incorporated in the Charter Party.

56.   **Grab Discharge:**
The vessel shall be suitable for grab discharge.  The Charterers shall have the liberty to use rubber wheels bulldozers in the vessel's holds not exceeding tanktop strength.

57.   **Valid Documents and Certificates:**
Vessel's documents and all certification required for ports of call under this Charter Party to be fully in order for the duration of this Charter Party.

58.   **Off-Hire for more than 30 consecutive days:**
Should the vessel be off-hire for more than 30 consecutive days, the Charterers have the right to cancel this Charter Party without prejudice to any claim they may have on the Owners, provided no cargo on board.

59.   **Taxes/Dues:**
Any taxes and/or dues on vessel levied by Owners country of domicile to be for Owners account.  All taxes, dues, income taxes whatsoever levied by any authority on the vessel and or charter hire and or freight applied by reason of ports visited or otherwise to be for Charterers account.

60.   **Governing Law:**
This Charter Party is governed by English Law.
Fror any dispute not exceeding US$50,000 then both principals agree to settle such dispute in accordance with LMAA Small Claims Procedure.

61.   **Grain Loading Certificate:**
The Owners guarantee that the vessel is self trimming bulkcarrier and shall be suitable for carrying full cargo of all permitted kinds of grain in bulk without requiring shifting boards, bagging, strapping, securing or fittings.  The vessel shall have on board the current grain loading certificate in compliance with IMO last regulations.

- 9 -

62. **Requisition:**
Should the vessel be requistioned by the government of the vessel's flag during the period of this Charter Party, the vessel shall be off-hire during the period of such requisition, and any hire paid by the said government in respect of the requisition period shall be retained by the Owners in the event of such requistion, the Charterers shall have the option to cancel this Charter Party.

63. **Financial Responsibility:**
Vessel shall at all times have a valid certificate of Financial Responsibility for water pollution. Owners also undertake to comply with any law or regulation in force at any place to which the vessel may be ordered concerning oil pollution or other pollutants.

64. Charterers have the right to supply Ocean Routes Inc. but 'the Applied Weather Technology Services' not to be appointed by the Charterers as a routing service to the Master during voyage specified by the Charterers. The Master to comply with the reporting procedure of the Ocean Routes Inc. Master to follow Ocean Routes recommendations.

65. No drydock, but only in case of emergency.

66. For telex/victualling/communications/entertainment Charterers to pay US$1,750 (One Thousand Seven Hundred and Fifty Dollars) per month or pro rata.

67. **Trading Exclusions:**
All war/war-risk/warlike, terrorist, piracy zones/areas as defined by war risk underwriters terms and fall under current exclusions or any areas that might be introduced by vessel's insurance underwriters during the currency of this charter, countries restrictive to vessel's flag/registry, any countries that are or may fall (or become subject to) under UN sanctions or embargoes are excluded and the following countries, New Zealand, Australia, North Korea, Cambodia, Iraq, Liberia, Abkhazia, Eritrea, Libya (including Gulf of Sirte/Sidra), Israel, Lebanon, Sierra Leone, Guinea Bissau, Zaire, Yemen, Canada, Gambia, Slovenia, Turkish occupied Cyprus, Sea of Azov, Sweden, Norway, Finland, Denmark, Orinocco River West of Matanzas, Amazon River West of Munguba, Cuba, Zaire, Angola (including Cabinda), Syria, Ethiopia, Somalia, North and South Yemen, Sri Lanka, Great Lakes, CIS Pacific.
Vessel is further not ordered to or bound to enter any place where fever, epidemics, pestilence or plague is prevalent. If discharging in Iran, cargoes from Argentina to be excluded.

68. **Permitted Cargoes:**
Bulk grain and/or grain products including and/or agricultural products and any of their by-products always excluding: extraction pellets, oil cakes, sunflower seed expellers, Niger seed expellers, palm kernals, linseed, manioc meal, copra, wheat bran, rice, seed cakes, cotton seed expellers or any other type of expeller.

- 10 -

68. cont ....

All cargoes to be loaded/stowed/trimmed/carried/discharged by Charterers in accordance with I.M.O. and/or local regulations, to be harmless/lawful/non-corrosive and suitable for carriage by this vessel. Otherwise all UN excluded/restricted cargoes and any cargoes that may be boycotted or cause the vessel to be boycotted and any other cargoes are excluded from this Charter.

69. Hire to be paid, less commissions, each 15 (fifteen) days in advance by telegraphic transfer to:

National Bank of Greece
Shipping Branch
2 Bouboulinas Street & Akti Miaouli
185 35 Piraeus – Greece
Swift: ETHN GR AA
Account No: 196-932357 07
IBAN: GR4001101960000019693235707
Beneficiary: DIVA MARITIME COMPANY
Ref: Hire of m.v. "BASIL" C/P DD 15.5.2009

First 15 days hire, plus value bunkers on delivery to be paid within three days of delivery.
Value of bunkers on redelivery to be deducted from last hire payment.

70. **ISM Clause:**
From the date of coming into force of the International Safety Management (ISM) code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the ISM Code) shall comply with the requirements of the ISM code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expenses or delay caused by failure on the part of the Owners to "The Company" to comply with the ISM code shall be for Owners account.

71. All documents/certificates to be valid/kept on board by Owners including compliance with ISM (International Safety Management) regulations carrying an accredited SMS/ISM certificate issued by the flag state. The auditors is "B.V." also vessel is Y2K compliant.
Vessel's class: ABS

72. Fixture to be kept strictly Private and Confidential.

- 11 -

73.    Owners/vessel to provide/tend proper cargo ventilation/ventilation policy which includes regular recording of outside air temperatures, cargo holds temperatures and calculation of dew points and recording of ventilation times in the log book. It is understood that the vessel can supply natural ventilation only.

74.    Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage (whether or not signed on behalf of the Owners or on the Charterers behalf or on behalf of any sub-Charterers) incorporating where not compulsory applicable, the Hamburg Rules or any other legislation imposing liabilities in excess of Hague/Visby Rules, the Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of the clause.

75.    In the event that the Owners are requested to produce an IMO Certificate of Compliance to carry solid bulk cargoes at discharge port, Charterers to advise Owners before commencement of loading of cargo description.

76.    For the purpose of calculating charter hire, delivery and redelivery time to be computed on the basis of GMT.

77.    **Charterers Agents both ends:**
Charterers agents to attend to Owners customary minor matters without charging agency fee but costs for actual items to be for Owners account. In case of major repairs/G.A. then Owners to appoint own agents or Charterers agents against paying agency fee as per tariff.

78.    **Double Banking Clause:**
Charterers have the privilege, where and when it is customary and safe for vessels of similar size and type to do so, to double bank the vessel, i.e. may order the vessel alongside any other vessel or vice versa, however, all additional costs/arrangement (including arranging fenders to be put between vessels) / time / responsibility arising from this double banking operation to be for Charterers account, Charterers are to provide Yokohama or Yokohama type fenders if available otherwise sufficient fenders to be provided up to Master's satisfaction. Double banking operation to be carried out solely at Master's discretion as regards safety of crew, vessel and cargo.

Master to have the right to order the other vessel(s) away from his vessel or to move his own vessel away should this be necessary to protect the crew/vessel and cargo, but vessel always remaining on hire in such instance.
Such operation(s) to be performed within port(s) trading limits only. Extra insurance, if any, to be for Charterers account.

79.    Charterers have the benefit of any return insurance premium receivable by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 (thirty) days, provided vessel is on hire and provided vessel anchored in an area approved by the London Joint Hull Committe.

- 12 -

80.    **Lien Clause:**
In no event shall Charterers procure, or permit to be procured for the vessel, any supplies, necessaries or services without previously delivering to the Master of the vessel a statement signed by an authorised representative of the furnisher thereof, acknowledging that such supplies, necessaries or services are being furnished on the credit of Charterers and not on the credit of the vessel or on her Owners, and that the furnisher claims no maritime lien on the vessel therefore.

81.    **New Both to Blame Collision Clause:**
If the liability for any collision on which the vessel is involved while performing this Bill of Lading fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:
"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, pilot or servants of the carrier in the navigation or in the management of the vessel, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claims against the carrying ship or carrier."
The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

82.    **War Risks Clause for Time Chartering, 1993**
**Code Name: "CONWARTIME 1993"**

(1)    For the purpose of this Clause, the words:

(a)    "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the vessel, and the Master, and

(b)    "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags, or ownership, or against certain cargoes, or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

- 13 -

82.    cont ....

(2)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)    The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention and blocking and trapping the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(4) (b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the at the same time as the next payment of hire is due.

(5)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)    The Vessel shall have liberty:-

(a)    to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions.

(b)    to comply with the orders, directions or recommendations of any war risk underwriters who have the authority to give the same under the terms of the war risks insurance;

- 14 -

82.    cont ....

(c)    to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d)    to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e)    to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners intention to do so and requesting them to nominate a safe port for such discharge.

Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8)    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of this Charter Party.

83.    **New Jason Clause:**
In the event of accident, danger, damage or disaster before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which or for the consequence of which the carrier is not responsible by statute, contract or otherwise, the goods, Shippers or Consignees or Owners of the goods shall contribute with the carrier in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage or special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid as fully as if such salving ship or ships belonged to strangers. Such deposit, as the carriers or its agents may deem sufficient, to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers or Consignees or Owners of the goods to the carriers before delivery.

84.    In case original Bills of Lading not available at discharge port, Master/Owners to release cargo against Letter of Indemnity, wording as per Owners P and I Club wording signed by Charterers only.

- 15 -

85.     In case vessel arrives at delivery point prior of laydays commencement, then Charterers
        to arrange holds conditions inspection prior of her actual delivery.  Charterers to be
        responsible of one set of inspections fees only.

86.     Vessel has not called C.I.S. Pacific under present Management since February, 1997.

87.     Vessel to carry on board an approved trim and stability manual in accordance with
        requirements of Chapter V1 Solas Regulations 1974 and IMCO document BC
        X1X/INF.4 concerning 'filled holds ends untrimmed'.

88.     Owners/Master to take all reasonable precautions to prevent water ingress through the
        vessel's hatch covers.

89.     Owners warrant that the vessel is fully insured for Pollution Liability in order to trade
        within the areas agreed under this Charter Party.  Such insurance shall have a minimum
        cover of US$500 million.

90.     Following documents to remain on board vessel for the duration of this charter:
        Valid Classification certificate.
        Current ISM certificate.
        ISS and ISPS code.

91.     **Separation:**
        In case (2) two or more different cargoes/grades of bulk cargo is to be loaded to the
        same cargo hold, time charterers to be entirely responsible for the compatibility of
        cargoes involved and separation and in case of any commingling of cargo or
        contamination taint and/or alteration of chemical properties time charterers again to be
        entirely responsible for same and Owners to be kept harmless of any/all consequences.

92.     **Total Quantity:**
        Cargo(s) which have been loaded in vessel's holds without separation and more than 1
        (one) Bill of Lading have been issued with more than 1 (one) port of delivery of cargo,
        Owners/Master and vessel are not to be responsible to delivery of cargo Bill of Lading
        by Bill of Lading to different consignees and different port(s)/berth(s) but only for the
        total quantity on-board the vessel.  However, in such case, Charterers will arrange
        appropriate draft survey at load and discharge ports and findings to be counter signed
        by Master.

*********

## GENERAL PARAMOUNT CLAUSE

All the Bills of Lading issued under this Charter Party shall contain the following Clause:

"This Bill of Lading shall have affect subject to the provisions of any legislation relating to the carriage of Goods by Sea which incorporates the rules relating to Bills of Lading contained in the International Convention dated Brussels, 25th August, 1924, and which is compulsorily applicable to the contract of carriage herein contained.
Such legislation shall be deemed to be incorporated herein but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this Clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of, liability".

**BIMCO Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**

--------------------------------------------------------------------------------

(a) Without prejudice to anything else contained in this Charter Party, the
Charterers shall supply fuels of such specifications and grades to permit the
Vessel, at all times, to comply with the maximum sulphur content requirements
of any emission control zone when the Vessel is ordered to trade within that
zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators
and bunker surveyors used by the Charterers to supply such fuels shall comply
with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in
respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss,
liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to
comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in
respect of the supply of fuels in accordance with Sub-clause (a), the Owners
warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and
with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content

when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause
(a), the Charterers shall not otherwise be liable for any loss, delay, fines,
costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14
and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in
MARPOL Annex VI and/or zones regulated by regional and/or
national authorities such as, but not limited to, the EU and the US
Environmental Protection Agency.

## BIMCO ISPS CLAUSE – FOR TIME CHARTER PARTIES

(A)

(I)      From the date of coming into force of the International Code for the security of ships and of port facilities and the relevant amendments to Chapter XI of Solas (ISPS Code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "The Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "The Company" .  Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers.  The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(II)     Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "The Company" to comply with the requirements of the ISPS code or this clause shall be for the Owners account.

(B)

(I)      The Charterers shall provide the CSO and the ship security officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the CSO and SSO/Master, furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:      "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".

(II)     Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers account.

(C)      Notwithstanding anything else contained in this Charter Party, all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers account, unless such costs or expenses result solely from the Owners negligence.  All measures required by the Owners to comply with the ship security plan shall be for the Owners account.

(D)      If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

********

# EXHIBIT "B"

THIS AGREEMENT IS MADE the 14th day of August 2009

BETWEEN:

(1)    DIVA MARITIME COMPANY ("Owners")
(2)    MOWBRAY SHIPPING LIMITED ("Charterers")
(3)    GULF RESOURCES DEVELOPMENT CORPORATION ("GRDC")
(4)    OVERSEAS MATERIAL SUPPLY ("OMS")

WHEREAS:

(1).    By a charterparty dated 15th May 2009 ("the Charterparty") the Owners let to the Charterers their vessel BASIL ("the Vessel") for a time charter trip via East coast South America to Persian Gulf. The Charterparty provided inter alia for bills of lading to be issued as presented in strict conformity with Mate's Receipts and to be released immediately on completion of loading.

(2).    Pursuant to Charterers' orders the Vessel proceeded to San Lorenzo, Argentina, where she loaded a parcel of yellow corn said by shippers to weigh 32,236MT and a parcel of soya bean meal said by shippers to weigh 7370 MT. Mate's Receipts were issued for those parcels naming Nidera SA as shipper and Iran as the intended place of delivery. The Master conferred authority on Charterers' agents at San Lorenzo to issue bills of lading on his behalf in accordance with the Charterparty. To date no bills of lading have been issued in respect of either of these parcels, due to Charterers' initial delay in procuring the information which they wished to include in the bills of lading, which information is now to hand.

(3).    Thereafter the Vessel proceeded to Bahia Blanca where she loaded a parcel of soyabean meal said by shippers to weigh 6500 MT ("the Toepfer Parcel") for which a Mate's Receipt was issued naming Alfred C Toepfer International Argentina SRL as shipper and Iran as the intended place of delivery. The Vessel also loaded at that port a parcel of soyabean extracted toasted pellets said by shippers to weigh 16,500 MT ("the Oleaginosa Parcel") for which Mate's Receipts were issued naming Oleaginosa Moreno Hermanos SA as shipper and United Arab Emirates as the place of destination. The Master conferred authority on Charterers' agents at Bahia Blanca to issue bills of lading on his behalf in respect of those parcels in accordance with the Charterparty. To date no bills of lading have been issued in respect of the Toepfer Parcel. Bills of lading dated 3rd July 2009 ("the First Oleaginosa Bills") were issued by Agencia Maritima Nabsa SA in respect of the Oleaginosa Parcel naming Oleaginosa as shipper and Dubai UAE, as port of discharge. Further bills of lading dated 3rd July 2009 ("the Second Oleaginosa Bills") in respect of a part of the Oleaginosa Parcel said to weight 11927 MT were issued by the Charterers naming OMS as shipper and Bandar Imam Khomeini ("BIK"), Iran, as place of discharge.

(4).    GRDC have asserted that all parcels of cargo loaded on the Vessel (together referred to as "the Cargo") have been bought by and are now owned by GRDC who now wish to have bills of lading issued in respect of the Cargo in the terms attached hereto as Appendices 1-5 ("the Bills of Lading") and which name OMS as shipper and BIK as the place of discharge. Because of their late issuance, the Bills of Lading would not be available for presentation to the Vessel upon her arrival at BIK and Charterers, GRDC and OMS are desirous that, notwithstanding the absence of the originals of the Bills of Lading at BIK

upon the Vessel's arrival there, the Cargo should be discharged from the Vessel without presentation of any of the originals of the Bills of Lading to be held there on the terms of this agreement.

(5).    The parties have agreed upon the following terms to give effect to the foregoing.

NOW IT IS HEREBY AGREED AS FOLLOWS:

1.    Subject to prior fulfilment of the conditions precedent set out in clause 2 hereof, the Owners will procure the issuance of the Bills of Lading in the terms of those attached hereto at Appendices 1 to 5 inclusive to be dated on the date of their issuance and will permit discharge of the Cargo at BIK without production of any of the originals of the Bills of Lading to be held there on the terms of this agreement (save that the condition in clause 2 iv shall be a condition precedent only to the commencement of discharge but not to the issuance of the bills of lading). Any delay to the Vessel pending fulfilment of the conditions precedent shall count as time on hire, with all expenses for Charterers' account.

2.    The conditions precedent to the Owners' obligations under clause 1 hereof to issue the Bills of Lading as aforesaid and to permit discharge of any of the Cargo, and which Charterers, GRDC and OMS hereby undertake promptly to fulfil, are as follows:

   i.    the delivery up to Owners or their duly appointed agents of all originals of the First Oleaginosa Bills and the Second Oleaginosa Bills for cancellation

   ii    the receipt by Owners' of a written irrevocable undertaking from Charterers' appointed agents in BIK not to seek to apply to be registered as Vessel's registered agents at BIK for the Cargo or otherwise to act in that capacity

   iii    the receipt by Owners' agents at BIK of sufficient funds to enable them to settle port and harbour dues and expenses at BIK.

   iv    the receipt by Owners of an irrevocable written undertaking and acknowledgment from the entities named as notify parties in the Bills of Lading that (a) they will not seek delivery to them of any part of the cargo covered by the Bill of Lading in which they are so named without production of all three originals of that Bill of Lading, or, if any are retained by a bank for its own records but not for any interest of its own, all originals not held by that bank plus a letter of confirmation from that bank as provided for in clause 3 i (2) (a) hereof, which in each case they undertake to present to the Owners' registered agent in BIK and (b) they release Owners, their Managers, servants and agents from any and all liability for any loss damage or any other liability whatsoever arising or occurring after the Cargo has crossed the ships' rail and pending its release in accordance with this agreement.

   v    Receipt by Owners (by no later than 15th August 2009) of a further 16 days' hire under the Charterparty and Charterers' undertaking to pay further hire up to the date of redelivery in the event that the vessel is redelivered after that 16 day period

3.  The Charterers, GRDC and OMS hereby jointly and severally undertake and agree as follows:

    i.    that no part of the Cargo shall, following its discharge from the Vessel, be released to any party claiming delivery thereof unless and until

        (1)    all three originals of the Bills of Lading relating thereto or

        (2)    where any orginal of the Bills of Lading is unavailable due to its being retained in the banking system, (a) a duly signed and stamped letter from the bank in question stating that that original Bill of Lading is being retained by the bank for its records and that the bank has no interest of its own in the cargo of the Bills of Lading in question (b) all other originals of those Bills of Lading, but in any event at least one original of the Bills of Lading

have been delivered to the Owners' registered agent at BIK.

    ii    without prejudice to Charterers' responsibility for the performance of agency functions and the provision of and payment for matters as provided for in clause 2 of the Charterparty, the Owners have the right (to the exclusion of Charterers) to appoint, and register with the port authorities at BIK, registered agents for the Vessel's call at BIK, who alone shall have authority to release the Cargo or any part thereof in accordance with clause 3 i above under Charterers' risk and responsibility. Charterers undertake not to seek to register any agents of their own with the port authorities in BIK as being the "vessel's registered agents" in relation to the Cargo, and to provide all necessary assistance to Owners and their appointed agent to enable that agent to become registered with the port authority.

    iii.    Charterers have irrevocably instructed their appointed agents at BIK to remit to Owners' appointed agents at BIK on Owners' first demand the funds held by the Charterers' appointed agents on account of port and harbour dues and expenses to enable Owners' appointed agents to settle such dues and expenses (but Charterers shall remain responsible for furnishing Owners or their agents with sufficient funds to cover all such matters in the event that the Charterers' agents fail to effect such remittance on first demand), and that Charterers will pay to Owners or as they may direct on Owners' first demand such further sums as may hereafter accrue or become due in respect of all such matters

    iv    the Cargo shall be stored pending its release in accordance with this agreement, free of any risk, responsibility, cost, expense or other liability (including in respect of loss or damage) on the part of Owners, their Managers, servants or agents, and Charterers, GRDC and OMS shall indemnify the Owners, their Managers, servants or agents from and against any such matters and shall on demand reimburse Owners for the cost of obtaining such SOL cover as they may in their discretion seek to obtain (but any failure on Owners' part to obtain such cover shall have no bearing on the extent of Charterers' GRDC's and OMS's liability hereunder). The cost of the SOL cover amounts to US$19,500 per 30 days and the Charterers, GRDC and OMS jointly and severally agree to pay this amount for each 30 day period or part period until the cargo is collected up to a maximum of two 30 day periods.

v.   to indemnify the Owners, their managers, servants and agents and to hold all of them harmless in respect of any liability, loss, damage or expense of whatsoever nature which they or any of them may sustain by reason of the any of the events and matters recounted in the recitals and/or provided for in this agreement, including (without limitation) the issuance of bills of lading in the terms of those at Appendices 1 to 5 inclusive, the late issuance of bills of lading for the Cargo, the issuance of bills of lading which do not conform to the Mates Receipts and other cargo documents as to identity of shipper, discharge place or otherwise, the cancellation of the First Oleaginosa Bills and the issuance of the Second Oleaginosa Bills, the change of destination, cargo description and shipper for the Oleaginosa Parcel from that contained in the First Oleaginosa Bills, the carriage to and delivery at BIK of the Oleaginosa Parcel, and the discharge of the Cargo without production of any original Bill of Lading.

vi   in the event of any proceedings being commenced against the Owners or any of their servants or agents in connection with any of the matters referred to in sub-clause 3 v, to provide them on demand with sufficient funds to defend the same.

vii.   If, in connection with in connection with any of the matters referred to in sub-clause 3 v, the Vessel, or any other vessel or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the Vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property or to remove such interference and to indemnify the Owners in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified. 4.  In consideration of the issuance of bills in the terms of those at Appendices 1 to 5 inclusive, GRDC and OMS hereby guarantee the payment by Charterers of any hire or other sums which may hereafter become legally due under the Charterparty

5.   Owners hereby authorise Charterers, subject to Charterers complying with the terms of this agreement, to sign and issue Bills of Lading as appear in Appendices 1-5 to this agreement, for cargo actually loaded on board the M/V BASH, on behalf of the Master which bills must be strictly in accordance with and fully in compliance with the terms of the governing Charterparty, including but not limited to incorporation of the General Clause Paramount and the Charterparty dispute resolution clause

6.   This agreement shall be governed by and construed in accordance with English law and all parties hereby submit to the exclusive jurisdiction of the English High Court of Justice in London for the purpose of enforcement thereof

Signed....................................................................For and on behalf of Owners
Signed....................................................................For and on behalf of Charterers
Signed..R. Machavesh.............................................For and on behalf of GRDC
Signed..R. mashayhh...............................................For and on behalf of OMS
                                                                                    Corporation

HFWGR\282881-1